# Richmond.

## CHESAPEAKE AND OHIO RAILWAY CO. v. SPARROW'S ADMR.

### NOVEMBER 22, 1900.

Absent, Phlegar* and Buchanan,† JJ.

1. DEMURRER TO EVIDENCE—*Failure of Counsel to Sign—Bill of Exception.*—A demurrer to the evidence is a part of the record of the case, and no bill of exception to the ruling of the trial court thereon is necessary in order to enable this court to review such ruling. A demurrer to evidence and a bill of exception are wholly distinct and independent modes of proceeding. The failure of the plaintiff's counsel to sign the demurrer, under the facts of this case, does not affect the demurrer.

2. MASTER AND SERVANT—*Defective Appliance—Contributory Negligence.*— If it be conceded that the servant in this case lost his life by the use of a defective rope at a ferry, of which defect the master had notice, and which it was his duty to replace, still the servant had better knowledge of the condition of the rope than the master, and the defect, if any, was open and obvious, and it was contributory negligence on his part to continue to use it, and he is not entitled to recover.

Error to a judgment rendered by the Circuit Court of Nelson county September 5, 1899, in an action of trespass on the case, wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

*Harrison & Long,* for the plaintiff in error.

---

*This case was argued and submitted before Judge Phlegar qualified.
†Judge Buchanan was holding the Bar examination.

*Caskie & Coleman* and *B. T. Gordon,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This action was brought by James Sparrow's administrator against the Chesapeake and Ohio Railway Company for the recovery of damage by reason of the death of his intestate, which, it is alleged, was caused by the negligence of the defendant company.

At the trial, after the evidence on both sides was closed, the defendant demurred to the evidence, and the plaintiff joined in the demurrer. The amount of damages was thereupon inquired of by the jury, which found a verdict for the plaintiff, and assessed his damages at $2,000, subject to the opinion of the court on the demurrer to the evidence. The court overruled the demurrer, and gave judgment in favor of the plaintiff for the amount of damages ascertained by the jury. To this judgment, a writ of error and *supersedeas* was awarded by one of the judges of this court.

The defendant in error moves the court to dismiss the writ of error, or affirm the judgment complained of, as presumptively right, upon the ground that there is no bill of exceptions, and that the evidence which was adduced upon the trial in the court below has never been made a part of the record, and, therefore, cannot be considered by this court on review.

The object of a bill of exceptions is to bring into the record something that otherwise would not be part of the record, and it always relates to some ruling of the court thereon. The ruling of the court objected to was its judgment on the demurrer to the evidence in the cause.

It is recognized by decisions of this court, and generally accepted by the practitioners in the courts of the State as a correct distinction, that a demurrer to evidence and a bill of

exceptions are wholly distinct and independent modes of pro-
ceeding.

Judge John Marshall, representing the plaintiff in error, in
*Wroe* v. *Washington*, 1 Wash. 337, distinguished them as fol-
lows: " I would ask, if it be possible to liken a bill of exceptions
to a demurrer to evidence; they are different in form, in their
consequences, and in the conduct of the parties. In the former,
the parties still proceed to a trial of the issue; in the latter, the
jury are discharged immediately, or find a conditional verdict
only. In the former, the question is brought before the court
upon the motion of the objecting party only; in the latter, by
the act of both parties, since the demurrer offered by the one
is joined by the other. In the former, either party has the
right to the benefit of his exceptions before a superior court;
in the latter, the court, if the case be clear, may refuse to com-
pel the other to join in the demurrer, and leave the whole ques-
tion to the jury. The judgment upon reversal in the one case
is for a new trial, in the other, it is final and conclusive."

In the opinion of the court in that case, by Pendleton, P., it
was said: " In the case of *Keel & Herbert* v. *Roberts*, 1 Wash.
203, this court decided against the doctrine of taking a bill of
exception for a demurrer to evidence; but the counsel en-
deavored to distinguish that case from this, on account of the
whole evidence being stated in this, whereas in that, there was
a partial recital of the evidence, and says that the reason which
governed the court in that case was founded upon that distinc-
tion. Whether this was the only reason *assigned* by the court, I
cannot ascertain, not having my notes with me, but the judges
recollect that their distinction went farther, and that they con-
sidered the two modes as being so totally dissimilar, that the
one could not be considered as answering the purposes of the
other."

In discussing the office of a demurrer to evidence, the learned
author of Robinson's Practice, Vol. 1 (old Ed.), page 351, says,

that to avoid inconvenience, the modern practice is (especially in Virginia, where it has been sanctioned by repeated decisions of the Court of Appeals) to put all the evidence on both sides in the demurrer, and then to consider the demurrer as if the demandant had admitted all that could reasonably be inferred by a jury from the evidence given by the other party, and waived all the evidence on his part which contradicted that offered by the other party, or the credit of which is impeached, and all inferences from his own evidence which do not necessarily flow from it.   With these limitations, the party, whose evidence is demurred to, has all the benefits which the ancient practice was intended to give him, without subjecting the other party to its inconveniences; and no disputed fact is taken from the jury and referred to the court.

In other words, the modern practice requires the demurrant to tender with and as a part of his demurrer to evidence, a statement of all the evidence on both sides, in order to save the demurree the inconvenience of delay, and in taking a bill of exceptions to the refusal of the court to have made a part of the demurrer omitted evidence which he deems essential to a correct decision on the demurrer.   This latter course he may pursue or refuse to join in the demurrer, and if he is compelled to join in the demurrer, this ruling of the court comes under review in the appellate court under an assignment of error to the judgment of the trial court upon the demurrer to the evidence.

Among the cases cited in Robinson's Practice, *supra,* is *Norvell* v. *Camm*, 2 Rand. 68, and in the statement of that case it is said: "The demandants' counsel tendered to the court a demurrer to the evidence, alleging that it contained all the evidence which had been given on both sides" (then followed a statement of the evidence), "and that the tenants refused to join in the demurrer and the court refused to compel them." The ground upon which the tenants refused to join in the demurrer was that the demurrer tendered by demandants did

not contain all of their evidence, and this court held that the circuit court should have compelled the tenants to join in the demurrer to the evidence tendered by the demandants, stating the evidence of James London, in the particular in which the counsel of the parties differed, as the counsel of the tenants insisted it was.

In *Manderville* v. *Perry,* 6 Call, 78, Tucker, J., declared that a demurrer to evidence was a part of the record in an action at law, and the statement there made by him, as to what constitutes the record in an action at law, is quoted with approval in *White* v. *Toncray,* 9 Leigh, 351, and in *Roanoke L.. & Imp. Co.* v. *Karn & Hickson,* 80 Va. 589.

We have been unable to find a case, decided by this court, or any other, in which it was held that it is necessary to take a bill of exceptions to the ruling of the trial court upon a demurrer to evidence, in order to have it reviewed by the appellate court, or to bring up the evidence in the case as a part of the record, or that it is necessary to have the trial judge authenticate the evidence considered by him upon the demurrer to the evidence.

It seems clear that the uniform practice in this State has been, from the decision in *Wroe* v. *Washington, supra,* to the present time, for the party demurring to the evidence to tender to the court with, and as a part of, his demurrer, a statement of all the evidence in the case on both sides, as was done in the case in judgment, and if the other party joins in the demurrer, or is required by the court to do so over his objection, the evidence comes up to this court upon a writ of error, to be reviewed as an inseparable part of the demurrer which is made a part of the record by the judgment of the trial court thereon.

"A demurrer to evidence cannot be made a part of the record by bill of exceptions. It is as much a part of the record proper as the demurrer to the pleadings or the verdict of the jury." 6 Ency. Pl. and Pr. 457, and authorities cited.

The exact point, however, made by counsel for defendant in error is that, unless the evidence is made a part of the record by counsel for both parties signing the statement of it tendered by the demurrant with his demurrer, or by a bill of exceptions, or it be authenticated as the evidence, and all the evidence in the case, by a certificate of the trial judge, this court cannot assume that the evidence in the record is the evidence and all the evidence in the cause, and hence cannot consider it.

The judgment of the trial court in this case recites that "the demurrer of the defendant to the evidence being argued, it seems to the court that said demurrer is sufficient in law for the plaintiff to have," etc.; and, in the absence of any objection appearing in the record to have been made by the plaintiff to the evidence considered by the court upon the demurrer, and, in view of the fact that he joined in the demurrer, it must be presumed that the evidence referred to, in the judgment of the court, is the evidence embraced in the statement of it signed by the defendant's counsel and certified by the clerk, along with the order of the court reciting that it is all the evidence introduced at the trial; therefore, the motion to dismiss the writ of error must be overruled.

This brings us to the remaining question in the case, which is, whether or not the court below erred in overruling the plaintiff in error's demurrer to the evidence, and giving judgment for defendant in error.

Plaintiff in error owned and operated a ferry across Tye river, at New Market, in the county of Nelson, about a half mile above where it empties into the James. James Sparrow, defendant in error's intestate, was employed by plaintiff in error as ferryman, and had been in charge of the ferry for fourteen years. His residence was a mile and a half from the ferry, but there was a ferry-house where he stayed during the day, and often at night, situated a very short distance from the ferry, on the east side of the river. He was last seen alive at or near

the ferry on the afternoon of September 22, 1898. About six weeks afterwards, his remains were found at Swift's Island, in James river, some six miles below New Market.

There are projecting causeways or landings on each side of the river, where the roadway on opposite sides comes to its banks. These causeways project so far that at low water, when the boat is placed between them longitudinally, and is fastened to them respectively at each end, it creates a bridge or pontoon, over which foot passengers and wheeled vehicles can cross.

When the water in Tye river is high, this cannot be done, and the boat ceases to be a bridge, and is used as a ferry. That this may be conveniently done, a trolley wire rope is extended across the stream, and in line with the road. From this trolley to the boat a rope extends, which slips on the trolley wire by means of a running pulley, and is fastened to a ring on the inner side of the gunwale of the boat; the ring being situated about one-third of the length of the boat from that end of it which, in crossing the river, is in front, but the ring projects above the top of the side so that the rope attached to it is not rubbed against the gunwale. Rings are placed in this way upon each end, and the rope connecting the boat with the trolley rope is changed, as the boat is used in ferrying first one way and then the other. By this means the crossing is made, and the boat in high water makes its landings just below the causeways, which form the abutments of the bridge, or pontoon, when the water is low. The boat is about fifty feet long, and as the causeways are a little over fifty feet apart, it has some play, so that it can be slipped out from the gap with ease, and flaps, or wings, on hinges on the ends of the boat fill the gaps between the boat and the causeways when they are turned over. When the water rises so as to make it necessary either to use it as a ferry or to take it from between the causeways for safety, it is the duty of the ferryman to move it; if, to protect it, the rope from the trolley wire is attached to the ring nearest to the

end of the boat in the direction in which the boat is to go, the wings, or flaps, are turned back, the boat loosened at both ends; and, when it is slipped out of the gap, the rear end of the boat drops somewhat down the stream and the force of the water upon its sides, on the principle of the inclined plane, forces it to the bank nearest to the end of the boat somewhat up the stream, and it is placed in the eddy on the eastern side of the river just below the causeway—the side on which is the ferry-house. To take the boat out of the gap to be used as a ferry, it is manipulated in the same way.

A number of witnesses say that the best mode of placing the boat below the causeway, is for the ferryman to cross on the boat from the eastern side of the river to the place where it is fastened to the western causeway, then, to unfasten the chain which holds it and turn that end of the boat loose. Having done this, he should return and loosen the chain at the eastern end, getting back upon the causeway. He should then take the end of the chain in his hand, and allow the boat to float out from between the causeways, when he could easily bring it into the eddy water below the eastern causeway upon which he stands, and fasten it to a stob made for the purpose. Deceased's son, however, who was examined as witness for the plaintiff in the court below, says that deceased's usual mode of doing this was, to get into the boat, loosen both ends of it, and let it float out from between the causeways as if he was about to ferry some one across the river, thence, with a pole, to push it into position below the causeway, the boat being held, as he moved it, by the rope from the trolley wire.

During the night of September 22, 1898, a heavy rain storm came up, from which Tye river rose rapidly. On the morning of the 23d of September, when the river was still high, the boat used at the ferry was found at the mouth of Tye river, nearly filled with water, going round and round in the eddy, but with no one in it. The chain fastened to one end of it,

about twenty feet long, was dragging in the water. The chain at the other end was inside of the boat. A piece of rope some two or three feet long, one end of which was fastened to a ring in the inner side of the gunwale of the boat, was hanging over in the water. There were three poles in the boat at the time it was recovered, and a witness proved that it was usual for it to contain four poles.

How the boat got loose from its usual moorings, or how deceased got into the water so as to lose his life by drowning, are questions not answered by the evidence in the case—all is left to conjecture. One witness testifies that he lived near the ferry; that the night of the accident was cloudy; that he had been asleep and waking up, and having occasion to go to his window late in the night, he saw a light at the ferry, and heard a noise in the boat as if some one had picked up a boat pole. He also heard the river roaring as if it were pretty high. This is all the evidence tending to show that the deceased was in the boat that night.

The theory upon which the defendant in error (plaintiff below) proceeds is, that the deceased, on the night in which he lost his life, was engaged in removing the boat from between the causeways to a place of safety below the causeway on the east side of the river, in the manner described by his son, Walter Sparrow (stated above), and that while engaged in this undertaking, he was thrown into the river and drowned, either by the breaking of the pole used by him in pushing the boat to the bank (no cause of action for which is alleged in the declaration), or by the breaking of the heavy rope connecting the boat with the trolley wire, or by the simultaneous breaking of both.

The questions to be determined, therefore, are: First, was the plaintiff in error guilty of negligence in not supplying the deceased with a reasonably safe rope connecting the boat with the trolley wire, in order that deceased might use the boat as a ferry, or to conduct it to a place of safety in case of high water;

and, second, whether or not, the plaintiff in error's negligence being shown, the deceased was guilty of such negligence contributory to the accident which caused the loss of his life, as to disentitle his personal representative to recover in this action.

The condition of this rope connecting the boat with the trolley wire is the chief matter of dispute in evidence, and is the only cause of action alleged in the declaration in the case.

The morning after the boat was washed away, one end of the rope, some two or three feet long, was attached to the boat and was hanging in the water. The residue of it was hanging from the trolley wire. Both parts of the rope, as all the witnesses agree, indicated that it had been broken by violence, as the strands presented that uneven condition incident to such a parting.

It appears that the deceased applied to the depot agent of the plaintiff in error, nearest to the ferry, about the 1st of August, for a new rope for the ferry, and twice after inquired if the rope had come, but it is not shown that he told the agent what the rope was wanted for, whether to connect the boat with the trolley wire, or to fasten it to the bank when using it as a ferry or when put in a place of safety during high water; nor did he say that there was immediate need for it. A few days after applying for the rope, the deceased, referring to the rope connecting the boat with the trolley wire, stated that there was no danger of the rope breaking; that a railroad engine could not break it.

Witness O'Brien was with the deceased at the boat the evening of the accident, and noticed the rubbed condition of the rope. When recalled, he would only venture an opinion that it was not necessarily dangerous, and he evidently refers to ordinary conditions.

But let it be conceded, for the present, according to the rule governing in considering the evidence, that defendant in error's proof establishes the fact that the rope was in an unsafe condi-

tion; that deceased had asked for another, as claimed; and that plaintiff in error should have furnished a new one prior to this accident, was its condition such as to make the use of it, on that occasion, dangerous, and was the danger an open and obvious one to the deceased? Out of the mouth of defendant in error's witness, Spillman, we have it that the rope was in such a condition as to make it dangerous to use it in high water. When asked, " Do you think it would have been imprudent or rash in a man like Jim Sparrow in the boat, to rely upon that rope to get it behind the crib (causeway)?" he answered, " Yes, I do." Q. " In case of high water?" Ans. " Yes, sir."

All of the witnesses agree that the only defect in the rope was " it appeared to be somewhat frayed by rubbing on the side of the gunwale of the boat," so that, if it existed, it was a defect as open and obvious to the deceased as it was to any other person. He was in sole charge of the ferry, and his safety, so far as it depended on the conditions of the appliances used, was in his own hands. These appliances were of the simplest sort, and in the regular discharge of his duties, they were constantly brought under his notice, and he necessarily had knowledge of their condition. He was charged with the duty of inspecting them, and in case of defects which he could not correct, it was his duty to report them and have them corrected by his employer. If the rope was so defective as to make it dangerous to use it in handling the boat, that fact was better known to him than to any one else.

Here, then, was a sudden rise in the river, the deceased knew the condition of the rope, and with his long experience knew the perils of the situation caused by the high water, and knew best whether he could risk the rope that night under the existing circumstances.

To fix a liability upon the master for injuries sustained by a servant while engaged in his employment, the negligence of the master, as the proximate cause of the injury, must be proved by

affirmative evidence, which must show more than a probability of a negligent act.   Bailey on Mast. Liab., p. 503 *et seq.*

Among the cases cited by the author is *Sorenson, Adm'r v. Menasha Paper & Pulp Co.*, 56 Wis. 338, 14 N. W. 446, in which the opinion of the court says: " When liability depends upon carelessness or fault of a person or his agents, the right of recovery depends upon the same being shown by competent evidence, and it· is incumbent upon such a plaintiff to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury, and not be left entirely to conjecture, guess, or random judgment, upon mere supposition, without a single known fact." In that case, the only fact established was that an employee of the defendant was found bruised and dead in a hole which had been cut through the floor in the defendant's mill, and in which was water about six inches deep.   How he came there was left entirely to inference, and it was under those facts that the court said that "every party to an action at law has a right to insist ' upon a verdict or finding based upon the law and the evidence in the case, and not in the absence of evidence, upon mere inference, conjecture or personal experience."

In *Lehman* v. *City of Brooklyn*, 29 Barb. 234, a child was found drowned in a well on which the cover had been negligently left open; suit was brought against the city, and the opinion of the court says: " The gist of the action, however, is negligence, which must be made out and established from proof.   The proof need not be direct and positive, by some one who witnessed the occurrence, and saw how it happened, but it must be such as to satisfy reasonable and well balanced minds that it resulted from the negligence of the defendant.   It is not safe,   *   *   *   to say that because there was a well in the street, and a child was found drowned within half an hour after he was seen in health, the defendant's negligence is made out. To entitle plaintiff to recover, it must appear affirmatively that

the accident resulted wholly from negligence of the defendant, and that the negligence and imprudence of the plaintiff did not contribute to the result." See, also, *Payne* v. *R. R. Co.*, 40 N. Y., Super. Ct. 8; *Stager* v. *Ridge Ave. P. Ry. Co.*, 12 Atl. 821.

A case very similar to the case at bar in all of its phases, is *Meador* v. *Lake S., &c. Ry. Co.*, decided by the Supreme Court of Indiana, 46 Amer. St. Rep. 384. In that case, a defect in a ladder, an appliance not less complicated than a ferry rope, was the occasion of the injury complained of, and the lower court directed a verdict for the defendant. The Supreme Court, sustaining the judgment entered on the verdict, said:

"As a general rule, it may be assumed that the master, who employed the servant, had a better and more comprehensive knowledge of the machinery and materials to be used than the employee, who has claims for his protection against the use of defective, inadequate, or improper machinery, materials or appliances while engaged in the performance of the service required of him. The rule stated, however, is not applicable in all cases. Where the servant has equal knowledge with the master as to the machinery used or the means employed in the performance of the work he is required to perform, and a full knowledge of existing defects, it does not necessarily follow that the master is liable for injuries by reason of the use thereof.

" In cases in which persons are engaged in a dangerous service, it has been many times held that, if the machinery was defective and the plaintiff had knowledge of it, and made objection thereto, and was injured by reason of such defect, and he did not contribute to the injury by his own fault or negligence, he will be entitled to recover; but, in such case, greater care will be required of him than if he had not known of the defect.

" In cases, however, where persons are employed in the performance of ordinary labor, in which no machinery is used and no materials are furnished, the use of which requires the exer-

cise of great care and skill, it can be scarcely claimed that a
defective instrument or tool furnished by the master, of which
the employee has full knowledge and comprehension, can be
regarded as making out a case of liability within the rule laid
down.   A common laborer, who uses agricultural implements
while at work upon a farm or in a garden, or one who is em-
ployed in any service not requiring great skill and judgment,
and who uses the ordinary tools employed in such work, to
which he is accustomed, and in regard to which he has complete
knowledge, cannot be said to have a claim against his employer
for negligence, if, in using a utensil which he knows to be defec-
tive, he is accidently injured.

" In such case, it does not rest with the servant to say that
the master has superior knowledge, and has thereby imposed
upon him.   He fully understood that the spade, the axe, the
hoe, or the ladder, the instrument which he used, was not per-
fect, and if he was thereby injured, it was by reason of his own
fault and negligence.   The fact that he notified the master of
the defect and asked for another implement, and the master
promised to furnish it, in such a case does not render the master
responsible if an accident occurred.   A rule imposing a liability
under such circumstances would be far-reaching in its conse-
quences, and would extend the rule of *respondeat superior* to
many of the vocations in life for which it was never intended.
It is a just and salutary rule, designed for the benefit of em-
ployees engaged in work where machinery and materials are
used of which they can have little knowledge, and not for those
engaged in ordinary labor, which only requires the use of im-
plements with which they are entirely familiar." *The Jenney
E. L. & P. Co.* v. *Murphy*, 115 Ind. 566, and authorities cited.

The limitation of the application of the general rule, as ap-
plied in those cases, is consonant with common sense, reason and
justice, and is not in conflict with any case decided by this court,
wherein the machinery, materials or appliances used by the em-

ployee, or with which he came in contact in the course of his employment, are not to be compared as to simplicity to the appliances used in operating a ferryboat, such as is described in this case. They hold that a servant is under as great obligation to provide for his own safety from such dangers as are known to him, or are discernible by ordinary care on his part, as the master is to provide for him, and the negligence of the master does not excuse the servant from the failure to exercise such care, if such failure was the cause of the injury complained of. That a servant who knows the unsafe condition of the place in which he is working, or of the machinery, materials or appliances he is using, is not compelled to continue the work, but if he does continue it, without exercising ordinary prudence and care for his own safety, he must be held to have assumed, not only the risks ordinarily incident to the service when he entered upon it, but such as became known to him during the progress of the work, or which were readily discernible to a person of his age and capacity in the exercise of ordinary care. *Russell Creek Coal Co.* v. *Wells,* 96 Va. 416; *N. & W. Ry. Co.* v. *Graham,* 96 Va. 430; *Robinson's Adm'r* v. *Dininny,* 96 Va. 41; *N. & W. Ry. Co.* v. *McDonald,* 95 Va. 98; *N. & W. Ry. Co.* v. *Marpole,* 97 Va. 594; *Danville Street Car Co.* v. *Watkins,* 97 Va. 713; *Va. & N. C. Wheel Co.* v. *Chalkley,* 98 Va. 62.

In *Wells'* case, he set off a "shot" in a mine and shortly afterward went into the room where the "shot" had been fired, where he knew a piece of slate was loose overhead and was likely to become more dangerous as the result of the "shot," when a piece of slate fell on him. He was held to be guilty of contributory negligence.

In *Robinson's* case, *supra,* Robinson was clearing out an old mine shaft by digging from the bottom and allowing the material in another shaft, connected by a tunnel with the one he was at work in, to slide down. He was struck, or covered up,

by the falling material and killed, and although the court declared that this method of conducting the work was inhuman upon the part of the master, as there was a safer and better way to do it, yet the danger was open and obvious, and Robinson's administrator could not recover.

The decisions in the other cases cited are to the same effect.

The learned counsel for defendant in error urge upon us the rule that, if the evidence leaves the controversy even in such a state of uncertainty that reasonable men might differ concerning the material facts and the proper inferences to be deduced therefrom, the demurrer to the evidence should be overruled; but, keeping within a strict observance of that rule, we are unable to reach any other conclusion than that the evidence clearly establishes the fact that, if the deceased lost his life in the manner claimed, it was due to his own contributory negligence.

We are, therefore, of opinion that the judgment of the Circuit Court complained of is erroneous, and it will be reversed and annulled, and this court will enter such judgment as that court should have entered, sustaining plaintiff in error's demurrer to the evidence, and giving judgment, with costs, against defendant in error.

*Reversed.*