## PULASKI MINING CO. v. HAGAN.

(Circuit Court of Appeals, Fourth Circuit. May 7, 1912.)

No. 1,074.

1. TRIAL (§ 242*)—INSTRUCTIONS—REQUESTS TO CHARGE.

Requests to charge calculated to mislead or confuse the jury were properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 569–576; Dec. Dig. § 242.*]

2. TRIAL (§ 260*)—REQUESTS TO CHARGE—INSTRUCTIONS GIVEN.

Requests to charge substantially covered by instructions given may be properly refused.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

3. MASTER AND SERVANT (§ 265*)—INJURIES TO SERVANT—BURDEN OF PROOF.

In an action for injuries to a servant while loading a tank car with sulphuric acid by a portion of the pipe coming out of the sleeve connecting it with another portion, due to improper binding, the burden was on plaintiff, in order to establish a cause of action, to show that the method of loading the car was not reasonably safe, that defendant directed the use of such method, that plaintiff's own negligence did not contribute to the accident, and that plaintiff did not assume the risk of that method.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. § 265.*]

4. MASTER AND SERVANT (§§ 278, 281, 280*)—INJURIES TO SERVANT—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—ASSUMED RISK.

In an action for injuries to a servant while loading a tank car with sulphuric acid, evidence *held* to warrant a finding that the method used was not reasonably safe, that such method was adopted by defendant, and that plaintiff was not guilty of contributory negligence and did not assume the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977, 981–996; Dec. Dig. §§ 278, 281, 280.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessy, 38 C. C. A. 314.]

Dayton, District Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Virginia, at Abingdon.

Action by David F. Hagan against the Pulaski Mining Company. Judgment for plaintiff, and defendant brings error. Affirmed.

A. A. Phlegar, of Bristol, Va., and Joseph C. Wysor, of Pulaski, Va. (Phlegar, Powell, Price & Shelton, of Bristol, Va., on the brief), for plaintiff in error.

John S. Draper, of Pulaski, Va., and E. Lee Trinkle, of Wytheville, Va., for defendant in error.

Before PRITCHARD, Circuit Judge, and DAYTON and ROSE, District Judges.

ROSE, District Judge. We shall speak of the parties as they were below. We will call the plaintiff in error the "defendant"; the defendant in error the "plaintiff."

The defendant was a manufacturer of sulphuric acid. The plaintiff was one of its employés. He had worked in acid factories for 11

years. The defendant had been in business for four years. The plaintiff had been its process foreman during all that time. As such he had charge of the making of the acid and of the actual work of loading it upon the railroad cars for shipment. The permanent appliances used for loading were constructed by others. He says he had nothing to do with their inspection or repair. The acid was allowed to run by gravity from the tanks in which it was stored to the cars. The bottoms of these tanks were 10 feet or more above the level of the railroad track. From each of them ran a three-inch cast-iron pipe. They all connected with a single pipe of like size and material. By a suitable arrangement of stopcocks, the acid could be drawn from any desired tank without disturbing the contents of the others. At the end nearest the tanks an elbow united two pieces of pipe. They ran at right angles to each other so that when one piece was in a horizontal position the other would be vertical. By a rope or chain attached to the pipe near this elbow its end, when not in use, was raised so that the contents of all of it, except the portion beyond the elbow, would drain back into the tanks.

The defendant shipped on the average about two car loads of acid in every three days. Ninety-nine times out of a hundred the cars used were of such size and construction that the loading of them was safe and simple. When the portion of the pipe ordinarily suspended was lowered into a substantially horizontal position, the side of the dome of the tank car supported the horizontal portion of the pipe which at a point quite close to the elbow rested thereon. The perpendicular portion of the pipe extended down into the dome. The acid ran through the pipe directly into the car. About once in every six months a smaller car was used. Its dome was not high enough to support the horizontal portion of the pipe, nor was the perpendicular section of the latter long enough to reach down into the car. To load this car some special arrangement had to be made to support the weight of the pipe and to extend the perpendicular portion of it so as to carry the acid into the car. The accident happened while such an arrangement was in use.

The plaintiff's duties required him to be at times in a position in which he could look down into the dome of the car through the space between the perpendicular portion of the pipe or its extension and the sides of the dome. When in this position he was under the horizontal portion of the pipe. On the occasion in question that portion of the pipe parted or broke. He was drenched with the acid. More than 500 square inches of his skin were burned by it. He suffered great pain. Some portions of his body were so badly injured that the skin had to be taken from his legs and grafted upon them. One of his ears was in large part eaten off. He is permanently disfigured. Some of his muscles he cannot freely use. He claims that now whenever he is near acid he becomes so nervous that he can no longer work in an acid factory. He has not been trained to do anything else. At the time he was injured he was earning $107 a month. The jury found in his favor. It assessed his damages at $8,000.

[1, 2] The defendant assigns numerous errors. Some of them re-

late to the admission or rejection of testimony. We do not find substantial merit in any of them. The defendant asked for a number of instructions which were refused. Some of them were calculated to mislead or confuse the jury. They were for that reason properly denied. Others were unobjectionable, but the points raised by them were sufficiently covered by other portions of the charge which were given by the court either at the instance of the defendant or of its own motion.

If the case was one to go to the jury at all, it was submitted with instructions which fully and accurately stated the applicable law. The defendant, however, asked for a directed verdict. Whether the court below was right in denying this request is the only serious question raised by this record.

At the time of the accident, there was a sleeve on the horizontal section of the pipe at a point a short distance from the elbow. This sleeve united two separate pieces of pipe, each of which were screwed into it. The evidence would have justified the jury in finding that at the time of the accident the portion of the pipe next to the elbow came out of the sleeve.

The accident happened on the 26th of August, 1909. Prior to the 12th day of July of that year the plaintiff had taken a ten-day vacation. He says the sleeve was not on the pipe when he left. The pipe at that place was then, according to him, a single piece. When he came back, he found two pieces united by the sleeve. After his return he used the pipe as he found it to load some 31 cars of the ordinary size and shape. The accident took place upon the first occasion after his holiday at which he attempted to load the small car.

As before explained, the construction of this car rendered it necessary to add some special appliances to the ordinary apparatus. Under the horizontal portion of the pipe a prop was needed. In practice a piece of scantling was used for that purpose.

The plaintiff says that, before he entered the defendant's employ, he had never loaded such a car, nor had he ever seen one loaded.

For some time after he first came to the defendant's works, the small car was loaded in a way different from that used on the occasion of the accident. On such occasions the defendant had its lead-burners fasten to the perpendicular portion of the three-inch cast-iron pipe a flexible lead pipe long enough to reach into the opening of the dome of the car. This practice was followed for some years. The plaintiff gives a circumstantial account of how it came to be abandoned. About two years before the accident the small car was brought to the defendant's works. There was urgent occasion to load it and to send it off promptly. Plaintiff went for the lead-burners. He found them busy at something which also required instant attention. He reported the facts to one Landis, the defendant's superintendent. Landis went with him to the car and sent for a clothes line wire and a piece of four-inch iron pipe about two to three feet long. By direction of Landis the wire was tied around the elbow of the three-inch pipe. By it the four-inch pipe was suspended so that the top of that pipe came up around the lower end of the three-inch pipe, while the lower end

of the hanging pipe extended down into the dome of the car. The plaintiff says that all that Landis told him about it was:

"I think that is all right. We won't have to bother with the lead-burners any more."

Landis says he never heard of a lead pipe being used. According to him the plaintiff himself devised the method of loading the small car used at the time of the accident. When the plaintiff first employed it, he seemed very proud of it. He sent for Landis and showed it to him. Landis says that he then told the plaintiff he thought it would work all right if the latter was careful to see that the portion of the pipe on the factory side of the elbow was kept perfectly horizontal so that the four-inch pipe would not touch the three-inch pipe and would not be in any danger of binding or jamming between the three-inch pipe and the inner side of the dome of the car.

Here there was a direct conflict of testimony. We must assume that the jury believed the plaintiff. No eyewitness attempts to tell what caused the pipe to part. The suit was not instituted until 5½ months after the accident. During that time if the witnesses are to be believed, no one in the employ of the defendant, from its superintendent down, ever made the slightest investigation to find out why the accident happened.

The court below fully recognized that the burden of showing that the defendant was to blame rested upon the plaintiff. It told the jury that they could not infer negligence from the mere fact of accident or injury; that negligence caused the accident must be proved. They were further instructed that if there were two things which might have caused the accident, one or more of said causes being the negligence of the defendant, any one of the others being matters for which the defendant was not responsible, and the evidence left it uncertain which actually caused the injury, they must find for the defendant, as they must if the accident was caused by a hidden latent defect in a piece of pipe in the loading line which could not have been found out by the exercise of ordinary care on the part of the defendant. The court charged them that the pipe in the loading line was presumed to be sound and suitable for that purpose until the contrary was shown, and so far as the plaintiff relied upon the unsoundness of the pipe, the burden was on the plaintiff to show that it was unsound and unsuitable for that purpose and broke from that cause.

[3] At the argument at this bar the defendant contended that there was no sufficient evidence that the accident had happened as a result of its negligently using imperfect pipe or pipe with imperfect threads, or because of its pipe-fitters having been negligent in fitting the pipe into the sleeve. The defendant did not ask that the jury should be told that negligence in the above respects was not made out. If it be assumed that there is nothing in the record sufficient to hold the defendant liable for negligence in those matters, the case was, nevertheless, properly left to the jury if there was any evidence from which, if they believe the accident was caused by binding, they might still have found for the plaintiff. Defendant put on the stand a number of witnesses to show how the four-inch iron pipe might well have become bound or jammed between

the fixed three-inch pipe over which it was suspended and the side of the dome of the car. There is no question that, if such binding took place, the slightest additional movement of the car might have exerted a pressure upon the pipe line quite sufficient to have broken it or pulled it apart. If the jury believed that the accident was caused by such binding, they were entitled to return a verdict for the plaintiff provided there was evidence justifying them in also finding that:

First, the method of loading the small car used at the time of the accident was not reasonably safe.

Second, the defendant directed the use of such method.

Third, the negligence of the plaintiff did not contribute to the accident.

Fourth, the plaintiff did not assume the risks of that method of loading.

Was there evidence of all these things?

[4] First, was there evidence that the method of loading the small car was not reasonably safe?

According to the testimony, there is no danger when a flexible lead pipe is used to piece out the too-short iron pipe. There is evidence that this absolutely safe method had been used by the defendant. It had been abandoned. An employer is not required to use the safest method. A reasonably safe way suffices, whether there is a safer or not.

The defendant's evidence strongly tended to show that much danger attends loading in the way used at the time of the accident. It is true that it is said that this danger does not exist if those actually using the method are careful to get and keep everything in precisely the proper position. There is, on the other hand, evidence that a failure, even by a little, to make the proper adjustments, may sometimes lead to disastrous results. The peril is all the greater perhaps because at other times no such results follow. Whether an accident happens or not may depend upon the relative degree upon which during the loading the different car springs settle. A jury may well hold that a method which involves such risks and requires such care to avoid them is dangerous.

In this case the evidence shows that an absolutely safe way was known to the defendant and had been used by it. Such way was abandoned for a trivial reason, if the plaintiff's testimony be accepted as true. Under such circumstances, it was for the jury to say whether the method actually adopted was reasonably safe.

Second, was there evidence that the defendant directed the use of such method?

The plaintiff swears that it did. Whether he was telling the truth or not was a question for the jury.

Third, were the jury justified in finding that the plaintiff did not by his own negligence contribute to the accident?

He says that he was careful. No eyewitness undertakes to say that he was not. Defendant's experts say that the accident could not in their judgment have happened from binding, if he had been as careful as he should have been. How careful he should have been depends

upon how much he understood, or should have understood, of the dangers attending the use of the method he was following, and of how those dangers might be best guarded against. The burden of showing that the plaintiff was guilty of contributory negligence rests upon the defendant. There is nothing in the record which would have justified the court in ruling that as a matter of law the defendant had contributed to his own injury.

Fourth, were the jury entitled to find that the plaintiff had not assumed the risk involved in loading by the method which was in use at the time of the accident?

The court instructed the jury that if they believe from the evidence that the car could have been safely loaded if the pipe was not permitted to bind on the manhole, and the plaintiff knew, or should have known, that it was likely to bind during the loading unless prevented by himself or his helpers, and knew that such binding might break the loading line, he assumed the risk, and if such binding caused the injury he could not recover.

As the jury found for the plaintiff, it follows that they could not have believed that the plaintiff knew or should have known that the pipe was likely to bind, and that if it did bind the loading line might break.

The defendant's witness Landis swore not only that the plaintiff himself devised the scheme of loading in use at the time of the accident, but that he (Landis) warned him to be careful that the pipe did not bind. The plaintiff, on the other hand, swears that Landis devised the scheme, and that he (the plaintiff) never knew there was any danger in binding or had ever heard there was any. Defendant argues that this statement of plaintiff is not worthy of belief. It points out that in the course of his testimony he on more than one occasion mentioned that he was careful to see that the four-inch pipe hung loose and that it did not bind. The defendant argues that these statements show that he knew of the danger of binding and when exercising his ordinary care tried to guard against it. Plaintiff explains that he wanted the pipe loose because it was necessary for him from time to time during the loading to test the acid by lowering a bottle down into the car between the pipe and the side of the dome.

The credibility of such explanation was for the jury. They saw and heard him testify. It was their province to judge whether the use of the word "bind" by him as he did use it indicated that he was aware of the danger which might follow from binding, or whether, to describe the situation of things when the pipe jammed against the side of the dome, he was merely using a word with which during the preceding and pending trial he had become familiar.

The question of whether the plaintiff knew the danger from binding was therefore a question which was properly left to the jury.

Does the evidence show that, whether the plaintiff did know the danger or not, he should have known it?

The plaintiff had been for 11 years employed in acid works. For at least 4 years a part of his duties was to load the cars. On the other hand, according to his testimony, while he had loaded many

hundreds of cars, the occasion of the accident was the fourth time upon which he had ever loaded a car by the method then used. The most inexperienced man, if he stopped to think about it, would know that, if the weight of a car and its contents was pressing directly upon a piece of four-inch pipe, the other end of which was transmitting all such pressure to the pipe line, something would be likely to give way. So much may be taken for granted. It does not necessarily follow, however, that even an experienced man would know and appreciate that a slightly uneven settlement of the different springs supporting the car body might suddenly cause the pipe, which had been previously hanging loose, to bind. An expert witness for the defendant testified that, if one spring of the car settled 1¾ inches more than the spring on the other side, the side of the dome would be moved more than 11⅜ inches. We are not prepared to say that the plaintiff should have known and appreciated this risk.

It follows that the jury were entitled to find as they did, even if they believed that the accident was caused by binding.

The judgment below must be affirmed.

DAYTON, District Judge. I dissent. In my judgment the court below clearly erred in not directing verdict for defendant.

I. The Supreme Court has said in Meguire v. Corwine, 101 U. S. at page 111, 25 L. Ed. 899:

"A judge has no right to submit a question where the state of the evidence forbids it. Michigan Bank v. Eldred, 9 Wall. 544 [19 L. Ed. 763]. On the contrary, *where there is an entire absence of testimony*, or it is all one way, and its conclusiveness is free from doubt, it is competent for the court to direct the jury to find accordingly."

Again, it has said, at the conclusion of Arthur v. Cumming, 91 U. S. 365, 23 L. Ed. 438:

"As the case stood before the jury, the plaintiffs were clearly entitled to a verdict. The court therefore properly directed the jury to find accordingly. Schuchardt v. Allen, 1 Wall. 359 [17 L. Ed. 642]. It would have been error to refuse so to instruct them."

The rule, in different words, is enunciated by Justice Harlan in Delaware, etc., R. R. Co. v. Converse, 139 U. S. at page 472, 11 Sup. Ct. at page 570, 35 L. Ed. 213:

"But it is well settled that the court may withdraw a case from them altogether and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it. Phœnix Ins. Co. v. Doster, 106 U. S. 30, 32 [1 Sup. Ct. 18, 27 L. Ed. 65]; Griggs v. Houston, 104 U. S. 553 [26 L. Ed. 840]; Randall v. Baltimore & Ohio Railroad, 109 U. S. 478, 482 [3 Sup. Ct. 322, 27 L. Ed. 1003]; Anderson Co. Commissioner v. Beal, 113 U. S. 227, 241 [5 Sup. Ct. 433, 28 L. Ed. 966]; Schofield v. C. & St. P. Ry. Co., 114 U. S. 615, 618 [5 Sup. Ct. 1125, 29 L. Ed. 224]. 'It would be an idle proceeding,' this court said, in North Penn. Railroad v. Commercial Bank, 123 U. S. 727, 733 [8 Sup. Ct. 266, 269 (31 L. Ed. 287)], 'to submit the evidence to the jury when they could justly find only in one way.'"

In Patton v. Texas & Pacific Ry. Co., 179 U. S. at page 660, 21 Sup. Ct. at page 276, 45 L. Ed. 361, Justice Brewer, after quoting the

above passage and adding that "cases are not to be lightly taken from the jury," and that appellate courts are loath to reverse where the court below has refused to do so, says:

"At the same time, the judge is primarily responsible for the just outcome of the trial. He is not a mere moderator of a town meeting, submitting questions to the jury for determination, nor simply ruling on the admissibility of testimony, but one who in our jurisprudence stands charged with full responsibility."

The decisions in federal practice touching this rule are numerous and uniform. I do not mean to intimate that it is denied in this case by my brother judges in the majority. On the contrary, I understand it to be conceded by them. My sole purpose, in this preliminary, and what would be otherwise wholly unnecessary, discussion, is to emphasize the fact that, under the law as it now stands: (a) The asking for such peremptory instruction is a matter of right existing in favor of either or both parties to the case if they desire to exercise it; (b) that, if asked, it becomes the judge's duty to weigh and sift the evidence to ascertain whether it is so conclusive as to come within the rule; and, if so (c) he is required to grant the motion just as readily as he would set aside a groundless verdict. In other words, he cannot shirk the responsibility. Nothing would be more unfortunate than to permit the rule to be interpreted so that in one case he could exercise the right to grant, and, in another equally as strong, refuse to grant the direction and leave the jury to do its will in the premises. The temptation may be strong sometimes, especially in cases like this one, where the character of the injury and the distressing condition in which the victim of accident is left for life appeals so strongly to the heart and sympathy, to flinch in discharge of this duty and put, if possible, the responsibility on the jury; but we have no right to do so. If remedies for such cases are to be provided, it must be by legislation. As judges, we must enforce the law as it is.

II. In all negligence cases of this character we must constantly bear in mind that the law as it exists declares: (1) The fact of accident carries with it no presumption of negligence on the part of the employer, and (2) it is an affirmative fact, for the injured employé to establish, that the employer has been guilty of negligence. (3) That it is not sufficient for the employé to show that the employer *may* have been guilty of negligence, but the evidence must point to the fact that he *was;* and where the testimony leaves the matter uncertain, it is not for the jury to *guess* between several possible causes, and find that negligence of the employer was the real cause when there is no satisfactory foundation in the testimony for that conclusion. (4) That while the duty of the employer to provide a safe place in which his employé is to work is a positive and nonassignable one, it is also true that there is no guaranty by the employer that the place and machinery shall be absolutely safe. (5) That employers are not bound to insure the absolute safety of machinery or mechanical appliances which they provide. They are not bound to supply the best and safest or newest appliances. They must use all reasonable care for the safety of their employés and provide them with reasonably safe and

suitable machinery for their use. Pages of authorities could be cited in support of these propositions. I have quoted them almost literally from Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, and Washington & Georgetown R. R. Co. v. McDade, 135 U. S. 554, 10 Sup. Ct. 1044, 34 L. Ed. 235. The Circuit Court of Appeals for the Eighth Circuit, in Midland Valley R. Co. v. Fulgham, 104 C. C. A. 151, 181 Fed. 91, after quoting from Justice Brewer in the Patton Case, very strongly states one of the principles in these words:

"Conjecture is an unsound and unjust foundation for a verdict. Juries may not legally guess the money or property of one litigant to another. Substantial evidence of the facts which constitute the cause of action (the employer's negligence) * * * is indispensable to the maintenance of a verdict sustaining it."

And these principles have been fully established and affirmed by the Supreme Court of Virginia, from which state the case here comes, in Railway Co. v. Sparrow's Adm'r, 98 Va. 640, 37 S. E. 302, and Railway Co. v. Cromer's Adm'r, 99 Va. 763, 40 S. E. 54. In this latter case that court quotes approvingly from Bailey on Personal Injuries, § 1672 et seq., as follows:

"Where it is necessary to show a certain state of facts, it is not sufficient to prove two or more different states of case one of which may be sufficient, but either of which may equally, under the testimony, have existed.

"The plaintiff must prove something which warrants the inference of negligence on the part of the defendant, and not base his case upon facts just as consistent with care and prudence as with the opposite.

"Where the evidence is equally consistent with either view—the existence or nonexistence of negligence—it is not competent for the judge to leave the matter to the jury. The party who affirms the negligence has failed to establish it. This is a rule which never ought to be lost sight of.

"An inference cannot be drawn from a presumption, but must be founded upon some fact legally established."

And both of these cases cited approvingly from Sorenson v. Pulp Co., 56 Wis. 338, 14 N. W. 446, these words:

"When liability depends upon carelessness or fault of a person or his agents, the right of recovery depends upon the same being shown by competent evidence; and it is incumbent upon such a plaintiff to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury—and not be left entirely to conjecture, guess, or random judgment, upon mere supposition, without a single known fact."

III. But we must bear in mind other legal principles, just as well established, in considering this case. These are: (1) The servant assumes the risk of dangers incident to the business of the master, but not the latter's negligence. (2) Upon this question of assumed risk, the true test is not the exercise of care on the part of the master to discover dangers, but whether the defect is known or plainly discernible by the employé. Where it is plainly discernible by the employé and he remains in the employment, he assumes the risk for the reason, as stated by Justice Holmes in Schlemmer v. Buffalo, R. & P. Ry. Co., 205 U. S. at page 12, 27 Sup. Ct. at page 409, 51 L. Ed. 681:

"A person who freely and voluntarily encounters it has only himself to thank if harm comes."

An employer's liability is not based upon the degree of danger to which his employé is subjected, provided that employé has arrived at the age of discretion, knows of the danger, and voluntarily undertakes the work. He assumes the risk of danger, his employer only being liable to exercise reasonable care to protect him from dangers in the place where he is to work or from defects in the appliances wherewith the dangerous operation is conducted—dangers and defects not obvious and known to the employé but which are known to, or by reasonable care exercised would be discoverable by, the employer. Here, too, pages of authorities could be cited. I deem it sufficient to cite Southern Pacific Co. v. Seley, 152 U. S. 145, 14 Sup. Ct. 530, 38 L. Ed. 391, wherein the Supreme Court decisions are cited and discussed.

Let us apply these principles to the facts in this case. It is undisputed that Hagan was a man of mature age and experience. He had for 11 years worked at the business, and for 4 years had been foreman of defendant's plant. He had charge of the making of the acid and, what is material here, of its loading from the storage tanks into the railroad tank cars. The mechanical means by which this loading was done was of the simplest character. The storage tanks were some 10 feet above the railroad tracks. By means of gravity, through a 3-inch cast-iron pipe, the acid was conveyed from each tank to the car. These cars were ordinary railroad tank cars with a dome on top through which the liquid was received. By an ordinary elbow coupling, a vertical section was attached to the pipe line to insert in this dome. No possible danger, apparently, could or did arise in the loading of ordinary tank cars. The company had, however, one customer who furnished, about once in every six months, a longer and lower tank car, into the dome of which the vertical section of the pipe line was too short to reach. To meet this difficulty, about two years before, either Landis or Hagan himself, or both together, took a four-inch section of pipe, two or three feet long, and, by means of a clothes line wire tied around the elbow of the main three-inch pipe, attached it so that it would hang loosely over the end of the vertical section of the main line pipe and secure the additional length required to reach the dome of this lower tank car. Four times this particular car, by this contrivance, was loaded by Hagan, without trouble or accident. It appears further, by Hagan's testimony alone, that while he was away on vacation a section of the main horizontal three-inch pipe that fitted into the elbow had been replaced with two shorter sections united with the ordinary coupling, collar, or sleeve. Hagan had loaded 31 ordinary tank cars after his return from his vacation and was engaged in loading this special one when the accident occurred. At the time he was standing by the vertical section of the pipe line looking down into the dome of the car when, for some cause, the horizontal pipe line above the elbow broke, parted, or pulled out of its collar, by reason of which he was drenched with acid and frightfully burned.

What caused this pipe to part or break? This evidence wholly fails to disclose. There are five counts in this declaration. They set forth

in minute detail the construction of the loading line and all the circumstances relating to the accident and the extent of the injury sustained. They also charge in great detail the duty and obligation of the company to furnish a safe place to work, and safe appliances with which to work and to inspect such appliances and so on; but when it comes to charging the specific cause of negligence which permitted the accident, the following are given: (1) In providing "an old, corroded, rotten, and unsafe cast-iron pipe"; (2) whose threads, where the same broke, were "negligently and improperly cut and insufficiently fastened by not being screwed far enough into said cuff, sleeve or collar"; (3) in failing "to have said pipe, its threads, and its connections inspected, repaired, and replaced"; (4) in failing "to have said pipe of proper material, the same being of cast iron," subject to corrosion around the threads at the joints; (5) negligently failed "to instruct the plaintiff as to the proper way in which to load said cars, but through defendant company's superintendent, M. P. Landis, instructed the plaintiff in an improper and unsafe way in which to load same * * * by fastening a four-inch pipe to a three-inch pipe * * * with wire instead of having a flexible and safe connection"; (6) in failing to "properly inspect and keep in proper repair the car in which said acid was loaded"; (7) in failing to furnish a level track on which to stand said car while it was being loaded, whereby the car, being improperly repaired, settled unevenly and caused it to bind upon and break the pipe.

The court below, upon the motion for a new trial, filed a written opinion in which the evidence is carefully analyzed and the *possible* causes of the break are stated to be: (1) An improper fitting of sound pipe; (2) the use of unsound pipe fully screwed up; or (3) the use of unsound pipe improperly fitted. But expressly says that a fourth cause, that of *binding*, "is to my mind vastly the more probable of the *possible causes* of the accident." Why was he in such doubt, and why was he seeking to find *possible causes* for the accident? Simply because, as I read this record, *there was absolutely no evidence whereby the real cause of the accident could be determined.* It was pure conjecture as to *possible* causes, for the reason, it is presumed, that there had to be *some* cause for it. This is exactly what the authorities I have cited say "is an unsound and unjust foundation for a verdict." On the contrary, "it is incumbent upon such a plaintiff to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury—and not to be left entirely to conjecture, guess, or random judgment." But the learned judge, still further speculating and conjecturing as to these *possible* causes, says:

"It seems to me that the evidence forbids *an assumption* of any reasonable probability that there was any inherent or originally unsound pipe at the defendant's plant."

He had necessarily to reach this conclusion because the evidence was undisputed that defendant bought its pipe from a standard factory, that it was the kind used in these operations, that its life in such use

was at least 10 years, and none of it had been used half that period of time. Still further indulging in conjecture, the learned judge says:

*"If we assume that there was no binding, the evidence tends and strongly tends to show that the defect was in the threads alone and was caused by exposure to the atmosphere or to the action of weak acid."*

And such a defect, *if it existed,* he goes on to argue, was one that ought to have been discovered by proper inspection. But did it exist? There is absolutely no evidence of exposure to weak acid and atmosphere. On the contrary, if Hagan's testimony is to be believed this collar had been put on less than three weeks prior, while he was on his vacation, and the expert testimony showed it capable of enduring a vastly greater weight or strain than was put upon it. But the learned judge is not satisfied himself with *this* conjecture, and finally reaches the conclusion that "the use of a pipe unsound in the threads, only partially screwed up," was the cause of the accident *"if binding did not occur."* This is simply reasoning in a circle and saying that, if one thing did not cause the breaking, another did, because it did break. The plaintiff in my judgment failed utterly to show by *facts* which cause, or that either cause, was responsible, and the doubts in the court's mind were the clearest evidence of this. But my Brothers in the majority here have apparently abandoned all conjectures save and except that "binding" was the cause of the break. With the utmost respect for their views, I am compelled to say that in my judgment: First, there is no sufficient legal evidence in the cause justifying such conclusion; and, second, that if there were, "binding," under the conditions set forth, was a plain, open, clearly discernible and known risk assumed by Hagan. The first statement needs no further consideration. The second turns on the use of the four-inch pipe attached by wire to the vertical section of the three-inch pipe so as to extend it into the dome of this car. Hagan had attached and used this arrangement four times covering a period of two years. Landis, the superintendent, testifies that it was originally devised by Hagan. Hagan, on the contrary, says that Landis devised it. It is absolutely immaterial which did so. Both were present when it was done, and Hagan expressed his judgment that it would work all right, or that he could see nothing wrong with it. It did work all right, and he worked it. From the start its operation was plain, open, and palpable. Hagan was not an automaton. He was a sentient human being. That it would bind, under certain conditions, was apparent to any one. One could not move it in putting it in the dome or in taking it out without seeing that it would bind. Any one, a mere child, will discover that if you hang a four-inch pipe over a three-inch one loosely in a vertical position, then pull its lower end out of plumb, binding will take place. Hagan knew it would bind. He tied it on and has testified that:

*"When we would tie that other pipe over, I always took notice that it was loose then, or not binding, and then we would put a prop under it an inch or perhaps an inch and a half, or if we got a stick two inches we would put that under it."*

It seems to me very clear that no man knows, or can tell, what caused this accident; that leaving it to the jury, some of its members

may have conjectured it to have been caused by unsound pipe, others by defective screws in the collar, others by the binding, and still others by, as even suggested by the learned judge below, a shortening of the length of the pipe when the collar was put on.  All is conjecture, and to affirm this judgment is to allow this "jury" to "guess" this $8,000 from defendant to the plaintiff.