## THE STUDENT.*

### (Circuit Court of Appeals, Fourth Circuit. May 25, 1917.)

### No. 1500.

SHIPPING ☞84(3)—LIABILITY OF VESSEL—INJURY TO EMPLOYÉ OF STEVEDORE.

Libelant's intestate, who was an employé of an independent contracting stevedore engaged in loading a ship, was fatally injured by the falling of a sling of copper plates being hoisted on board by means of a fall and tackle rigged to a boom furnished and put up by the ship. The falling of the sling was caused by the working loose of a pin in the shackle holding one of the guy wires from the boom. The evidence was conflicting, but warranted a finding that the pin came out because it was defective in that the threads on the screw end were worn and rusty. This defect could not be seen by the stevedores after the tackle was in place, but could have been when it was put together. There was also evidence that means were quite commonly used which would have prevented the accident, and that the contractor requested that such means be supplied and was refused. *Held*, that a decree holding the ship negligent and liable for the injury was sustained by the evidence.

Dayton, District Judge, dissenting.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Suit in admiralty by Mattie Kreszewski, administratrix of Karmier Kreszewski, deceased, against the British steamship Student and the Terminal Shipping Company. Decree against the Student, and Richard Watson, master and claimant, and the Charente Steamship Company, Limited, owner, appeal. Affirmed.

See, also, 238 Fed. 936.

George Forbes and John Phelps, both of Baltimore, Md., for appellants.

Walter L. Clark and George T. Mister, both of Baltimore, Md. (Harry B. Wolf, of Baltimore, Md., on the brief), for appellees.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
* Rehearing denied July 20, 1917.

Before KNAPP and WOODS, Circuit Judges, and DAYTON, District Judge.

KNAPP, Circuit Judge. The case in brief is this: On June 2, 1916, in the port of Baltimore, the Terminal Shipping Company, an independent contractor, was engaged in loading the steamship Student with a cargo of copper plates. The plates were piled in slings, which were hoisted aboard by means of a fall and tackle and two of the ship's booms, one over the side of the vessel and one over the hatch, the two falls connected therewith being attached together. Each boom was held in place by two guys, the boom over the side of the ship having one guy leading forward and the other aft, both guys being shackled to the head of the boom and made fast, after running through two blocks to eyebolts in the ship's rail. The lower block was secured to the eyebolt in the rail by a semicircular shackle through which a pin was inserted. The shackles and blocks and all the tackle used in hoisting the cargo belonged to and were furnished by, the ship, and the ship's crew had rigged them up and fastened the various parts together before they were turned over to the contractor. The shackle in question was rigged for use by putting the pin first through the unthreaded head of the shackle, then through the eyebolt, and then screwing it into the threaded head of the shackle.

About noon of the day named, and while the process of loading was going on, the shackle which held the aft guy suddenly gave way, in consequence of the pin coming out, with the result that the boom swung inboard, and a sling of copper was precipitated on the deck, striking the coaming of the hatch. The sling collapsed and some of the plates fell down upon Kreszewski, an employé of the shipping company, who was at work in the hold, inflicting injuries from which he died about a month later.

A few days after the accident he filed a libel against the vessel and the Terminal Shipping Company, to which answers were made by both respondents. In September following, upon suggestion of the death of Kreszewski, the suit was continued by his administratrix, and a second suit brought by libel in personam by the state of Maryland to the use of Mattie Kreszewski et al. The cases were consolidated and tried together. The trial court dismissed the libel as against the Terminal Company, held the ship solely liable for the accident, and awarded damages in the sum of $5,000.

The case turns on a question of fact which lies within narrow compass. That the accident was caused by the pin coming out of the shackle seems to be conceded on all sides. Why or how it came out is the point in controversy. The amended libel charges that the pin was defective and unsuitable, in that the screw-head which entered the threaded end of the shackle was so worn and rusty as to be liable to work out under normal use. On the other hand, the ship stoutly maintains that the pin was in good and serviceable condition, that it had been screwed in tightly by the boatswain with the aid of a marlin spike, and that it must have been tampered with by some one after the gear was turned over to the contractor. The claim that it

had been tampered with may be dismissed at once as a mere theory unsupported by any proof. The actual condition of the pin is the decisive issue.

Speaking generally, it appears that all the appliances furnished by the ship were of superior quality and strength. The testimony shows that they had been found sufficient to handle loads several times heavier than the sling of copper plates which were being put aboard when the accident happened. The testimony is also to the effect that a shackle pin in proper condition would not work loose in the two and a half days that the tackle had been in use and under the moderate strain to which it was subjected. Although this is hardly a case to which the doctrine of res ipsa loquitur applies, yet the fact that the pin did become loose gives support to the contention that it was not such a pin as the ship was bound to furnish (Reid v. Fargo, 241 U. S. 544, 549, 36 Sup. Ct. 712, 60 L. Ed. 1156); and this contention is aided, in our judgment, by the appearance of the pin itself, which was produced in court on the argument and submitted to our inspection. Whilst the body of the pin, which passed through the eyebolt, shows little evidence of wear or yielding to strain, the screwhead is evidently somewhat worn, the threads look dulled and lacking in sharpness, as from long use or imperfect construction, and there is some indication that it was more or less rusty when put in the shackle. In short, it seems a screw-head which might rather easily work out of place.

Nothing would be gained by a detailed review of the testimony respecting the sufficiency of this pin for the purpose required. The witnesses, expert and nonexpert alike, sharply disagree, and conflicting opinions would perhaps be formed by those who might now subject it to examination. Taking everything into account, we are inclined to the conclusion, which was reached by the learned District Judge, that the pin in question was shown to be defective and unfit by a slight preponderance of proof; and if this conclusion be accepted, the liability of the ship follows under familiar principles of law. The case is exceedingly close, and we can only express our best judgment after careful study of the record and personal observation of the shackle which caused the accident. On the whole we think the pin unsuitable, because of its worn and defective condition, and therefore not such a pin as the ship was under obligation to provide.

In support of this view, one or two observations may be added. It is admitted by the appellants that the condition of this pin could not be discovered by any examination which it was the duty of the contractor to make before accepting the tackle and putting it to use. To all appearance it was of good quality and in every way sufficient. The contractor had the right to assume that it was free from any defect that was not observable. If it was in fact unsafe by reason of imperfection or unfitness which could not be seen after it was inserted in the shackle, the responsibility therefor rested upon the ship and not upon the contractor, because the ship was bound to furnish tackle free from defects of that character.

Moreover, there were two ways at least in which the consequences of this particular defect might have been avoided. The first of these

was what is called a "preventer," which the contractor says the ship refused to supply, though request was made before the work commenced. On behalf of the ship it is earnestly denied that any such request was made until after the accident. This question of veracity was decided by the court below in favor of the appellees, and we are not persuaded that a different conclusion should be reached; and the evidence of record indicates that no serious results would have followed the giving way of the shackle if a suitable preventer had been provided. Another means of insuring safety would be to protect the pin from coming out by using a wire to hold it in place, or the pin might be so made as to extend beyond the threaded end of the shackle far enough to permit the insertion of a cotter pin, which would keep it in position. In a word, there appear to be appliances, well known and frequently used, that would presumably avoid the risk of a defect which was unobservable to the contractor, but which might readily have been seen by the ship's crew in putting the tackle together. In this case such precautions were doubtless deemed by the master to be quite unnecessary, because of the unusual size and strength of its tackle; but unfortunately it turned out that there was a concealed defect, such as we are constrained to hold, and a serious accident resulted which probably would not have occurred if proper measures had been taken to guard against it. The Anglo-Patagonian, 235 Fed. 92, 148 C. C. A. 586.

Affirmed.

DAYTON, District Judge. I dissent. To sustain this decree for $5,000 against this Steamship Company upon the evidence contained in this record, in my judgment, leads this court, in effect, to establish the doctrine that an employer must be an insurer against accident, not only to his own employé, but to the employé of his independent contractor, unless the accident results solely from the negligence of the injured employé himself. Such a decision of the case, in my judgment, annuls the well-settled rules that (a) the fact of accident carries with it no presumption of negligence on the part of the employer; that (b) the burden of proof is upon the injured employé, charging negligence, to show it by affirmative proof of substantial facts; that (c) it is not sufficient for the injured employé to show that the employer *may* have been guilty of negligence, he must show by evidence the fact that he *was*; that (d) conjecture is an unsound and unjust basis for recovery in negligence cases, and where it is uncertain which one of several things may have brought about the injury, for some of which the employer is liable and for some of which he is not, neither court nor jury are permitted to guess between these causes and find the negligence of the employer was the real cause; that (e) if an employer furnishes an independent contractor the means and appliances, and such contractor accepts them as sufficient, and undertakes, solely and alone, to direct and prescribe their use, the employer is not liable for accident occurring to the employé of the contractor incurred in their use; that (f) while an employer owes the duty to use ordinary care in supplying sound and sufficient appliances, he is not required (1) to make use of the safest known appliances and

instruments, nor (2) to discard one which is not of the safest possible kind which can be secured and supply something in place which may be safer, nor, (3) without regard to their cost and his ability to pay for them, to provide the newest and best kind of implements which may be in use in his line of business, nor (4) to provide machinery or appliances of any particular description; but he discharges his duty to his employé when he provides those which are in common and general use in his business, which are considered safe by other employers generally, who are engaged in the same business, and which may be safely operated by the exercise of ordinary or reasonable care. He cannot be made liable by reason of the fact that other appliances which are safer than his are also in common use, but he discharges his duty if the appliances which he furnishes are reasonably safe for the purposes intended, such, in short, as a prudent man would select and use, having in view his own protection. The fact that other appropriate means might have been used to do the work does not make it negligence on the part of an employer to use an implement also appropriate and ordinarily sufficient, although an accident results from its use. Nor are the rules requiring inspection based on any other principle or requirement than the use of ordinary care. Hidden defects in appliances are not required to be detected, nor is an employer required to tear his machinery apart to ascertain whether such defects do or do not exist. The fact that a clamp to which the guy-rope of a derrick was attached broke does not imply that the master with reasonable diligence might have discovered the supposed defect as held by the Court of Appeals of New York in Welsh v. Cornell, 168 N. Y. 508, 61 N. E. 891.

The principles set forth in the first four (a, b, c, and d) above paragraphs seem to me to be settled beyond question by these authorities:

"The fact of accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employé to establish that the employer has been guilty of negligence. * * * Second, that in the latter case it is not sufficient for the employé to show that the employer may have been guilty of negligence—the evidence must point to the fact that he *was*. And where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employé is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs." Patton v. T. & P. Ry. Co., 179 U. S. at page 663, 21 Sup. Ct. at page 277, 45 L. Ed. 361.

"When the evidence is equally consistent with either view—the existence or non-existence of negligence—it is not competent for the judge to leave the matter to the jury, the party who affirms the negligence has failed to establish it. This is a rule which never ought to be lost sight of. An inference cannot be drawn from a presumption, but must be founded upon some fact legally established." Bailey on Personal Injuries, § 1672 et seq., cited and approved in Railway Co. v. Cromer's Adm'r, 99 Va. 763, 40 S. E. 54.

"To fix a liability upon the master for injuries sustained by a servant while engaged in his employment, the negligence of the master, as the proxi-

mate cause of the injury, must be proved by affirmative evidence, which must show more than a probability of a negligent act." C. & O. Ry. Co. v. Sparrow, 98 Va. 630, at bottom of page 640, 37 S. E. 302, at page 306.

"Conjecture is an unsound and unjust basis for a verdict. Substantial evidence of the facts which constitute the cause of action, in this case of the alleged defect in the lift pin lever and automatic coupler, is indispensable to the maintenance of a verdict sustaining the cause." Midland R. Co. v. Fulgham, 104 C. C. A. (8th Ct.) 151, at page 155, 181 Fed. 91, at page 95. Citing M. K. & T. Ry. Co. v. Foreman, 98 C. C. A. 281, 174 Fed. 377; Kern v. Snider, 76 C. C. A. 201, 203, 145 Fed. 327, 329; Spencer v. R. Co., 105 Wis. 311, 313, 81 N. W. 407; Thomas v. R. R. Co., 148 Pa. 180, 23 Atl. 989, 15 L. R. A. 416; Hyer v. Janesville, 101 Wis. 371, 376, 77 N. W. 729.

"When liability depends upon carelessness or fault of a person or his agents, the right of recovery depends upon the same being shown by competent evidence, and it is incumbent upon such a plaintiff to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury—and not be left entirely to conjecture, guess, or random judgment, upon mere supposition, without a single known fact." Sorenson v. Pulp Co., 56 Wis. 338, 14 N. W. 446, cited and approved in R. R. Co. v. Sparrow, 98 Va. 640, 37 S. E. 302, and R. R. Co. v. Cromer, 99 Va. 763, 40 S. E. 54.

"The presumed fact must have an immediate connection with or relation to the established fact from which it is inferred. * * * The only presumptions of fact which the law recognizes are immediate inferences from facts proved. Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves be presumed. * * * The law requires an open and visible connection between the principal or evidentiary facts and the deductions from them, and does not permit a decision to be made on remote inferences." Manning v. Ins. Co., 100 U. S. at page 698, 25 L. Ed. 761; U. S. v. Ross, 92 U. S. at page 284, 23 L. Ed. 707.

As establishing the fifth (e) principle, set forth above, touching the nonliability of the principal to his independent contractor's employés, and which principle alone, in my judgment, should be determinative of and reverse this decree, I cite from Bailey on Master & Servant: Pierce v. O'Keefe, 11 Wis. 181; De Forrest v. Wright, 2 Mich. 368; Ohio South. R. Co. v. Morey, 47 Ohio St. 207, 24 N. E. 269, 7 L. R. A. 701; Little Miami R. Co. v. Wetmore, 19 Ohio St. 110, 2 Am. Rep. 373; Hughes v. Railroad Co., 39 Ohio St. 476; McCarthy v. Second Parish, 71 Me. 318, 36 Am. Rep. 320; Aston v. Nolan, 63 Cal. 269; Wabash, St. L. & P. Ry. Co. v. Farver, 111 Ind. 195, 12 N. E. 296, 60 Am. St. Rep. 696; Waltemeyer v. Railway Co., 71 Iowa, 626, 33 N. W. 140; Sweeney v. Railroad, 128 Mass. 5; New Orleans & N. E. R. Co., 61 Miss. 581; Deford v. State, 30 Md. 179; Speed v. Railway Co., 71 Mo. 303. Also the 90 cases cited in the note to section 621 of 1 Thompson on Negligence (last Ed. 1901), the note to St. Louis, I. M. & S. R. Co. v. Yonly, 9 L. R. A. 604, and the very elaborate opinion of Judge Richardson in Bibb's Adm'r v. Norfolk & W. R. Co., 87 Va. 711, 14 S. E. 163.

To cite authorities supporting the principles enunciated in the sixth (f) above paragraph I deem unnecessary—they are so many. They can be found in large numbers in notes to sections 3986, 3991, 3993, 3995, and 4031 of 4 Thompson on Negligence, and to the same section numbers in White's Supplements 1 and 2 to this work. In the very outset of a consideration of this case it seems to me the pleadings disclose a progressive and continuing "fishing" excursion, on the part of

libelants, in order to find some ground on which to base the charge of negligence, for which a parallel would be hard to find. It would be ludicrous if it did not relate to so pathetic a subject. The accident occurred on June 2, 1916. Five days after, on June 7th, while the unfortunate victim of it was still, at least, in a semiunconscious state, the original libel was filed in his name against the steamship alone, in which the negligence is alleged to have been "*either* because of the breaking of the pin, or because the same came out, because not properly secured at the time it was rigged up by the ship's crew." It further alleged that "all the tackle connected with the hoisting of the cargo belonged to and was furnished by the ship, and the ship's crew had rigged the same up *and made fast* the various parts thereof before the stevedore started to work." And five days after that, on June 12th, an amended libel was filed for the purpose of making the stevedore corporation a party for its failure to perform its duty of inspection, owed libelant, of the various tackle, and especially of the shackle and pin, "which inspection your libelant alleged would have disclosed the defects set out herein, and that therefore their neglect in this particular *directly* contributed to the aforesaid accident."

The sound rule of pleading, universally accepted, is that:

"The facts, as stated, must not be insensible or repugnant, nor ambiguous or doubtful in meaning, nor argumentative, nor in the alternative, nor by way of recital, but positive and according to their legal effect and operation." Saunders on Pl. & Ev. (5th Am. Ed.) vol. 1, p. 919.

According to this original libel, the tackle, including the shackle and pin, were *made fast* by the ship's crew; but the pin either broke, or else *was not made fast,* by reason of one or other of which the ship is charged to be liable. By the libel and amended one taken together, we are informed that the libelant was the immediate employé of the Stevedore Company; that such company failed in its nonassignable duty to him of inspecting the condition of the tackle, and especially the shackle and pin, which inspection would have disclosed either that the pin was defective or had not been made fast, and therefore *it* was the party directly responsible to him for his injury. Pure "guessing" as to what caused the accident and which one of two independent parties could be held liable to libelant therefor! On this same 12th of June, when this amended libel was filed, the ship's evidence was taken in open court, so done because the ship was anxious to sail. Seven witnesses were examined. The shackle and pin were produced and identified. The ship's storekeeper testified that on the day the ship came into port he inspected the tackle and oiled this shackle and pin; that he oiled them after they had been fastened to the rail; that they were all right and the pin was screwed in tight. The boatswain testified that he erected the tackle on the ship; that he screwed the pin in the shackle with a marlin spike "so it was real tight"; that it was sound and in good condition; that he "would swear that it would never come out." The second mate testified to the superior character of the ship's tackle and to the soundness of the shackle and pin. Sliney, first officer, testified that all the gears turned over to the Stevedore Company were of the highest standard, that they were overhauled and inspected under

his personal supervision while at sea, and that a personal inspection thereof was made by him as it was erected, and a certificate of such inspection, signed by himself and the captain, was sent to the office of the company, a cautionary requirement, on the part of the company, wholly unusual. He testified to the soundness of the pin and shackle and its careful inspection before use. To the same effect on these points was the testimony of Watson, the captain.

This evidence completely and finally disposed of the two alternative charges of negligence against the ship relied on in the original and amended libels, that "either because of the breaking of the pin, or because the same came out, because not properly secured at the time it was rigged up by the ship's crew." The bolt spoke for itself. It was not broken nor even bent. The testimony of the ship's boatswain that he screwed the pin into the shackle with a marlin spike so tight he would have sworn it would never come out was not attempted to be disputed. That this was the proper way to secure it was not denied. That the shackle and pin were sufficient in strength and general effectiveness for the work was not only not denied, but corroborated by both the Stevedore Company's foreman and boss rigger. Brink, the foreman, when asked the question, "One of the best equipped ships in gear and tackle that you had seen in some time, wasn't it?" answered, "Yes; the gear was perfect, the tackles were good, and their derricks were able." After examining the shackle and pin, he was asked, "With your experience, wouldn't you say that was an ample and satisfactory shackle and pin for the use it was performing?" and answered, "I think that ought to answer the purpose."

Kacher, the rigger, testified as follows:

"Q. You have seen this pin and shackle; tell me whether or not you time and time again discharge ships with shackles no better than that and often not as good? A. Yes; even some of them not as good, even some of them not as strong. Some of them, as I said, only five-eighths. The Court: And even with threads much more worn? The Witness: Yes; even just as bad. Q. And even more than that? A. Yes; you cannot say that is a real bad shackle or a real good shackle, that is just in between. Q. As a matter of fact, you would not condemn this as a bad shackle, would you? A. No, sir; not on a guy; even a shackle like that you could have it on a hoisting fall. Q. It is strong enough even for that? A. If it pulls plumb. The Court: But, as I understand you, with a shackle of that kind it ought to be secured by wire. The Witness: It would be a preventer against the pin working out. Q. Of course, you do not expect the ship to furnish you with brand new tackle and pins and bolts each time you discharge cargo? A. No, sir. They have them up there sometimes five or six or ten years. They stay there until they wear half way through. But that is not the case there. Mr. Mister: And they stay there until they break sometimes, don't they? The Witness: Sometimes they do and sometimes not. Sometimes they order them out. But this is the first case I have ever seen since I have been around the wharf since 1884 where it carried away in that manner. Often they will work out aloft, but I have never seen an instance of this kind. Q. You have never known of a pin in a shackle used as a guy on a derrick of this size to work out? A. I have seen some of them work out by the working of the guys, but never to do any damage like this here. The Court: They were noticed before they came out, is that it? The Witness: Even if they came out, the boom was amidships, or it did not do any damage. Q. At the time this was being worked, it was exclusively in the charge of the Terminal Stevedoring Company, was it? A. Yes. Q. You are their boss rigger, are you not? A. Yes."

But getting back to the pleadings: On July 7, 1916, the ship's master filed answer to the original libel denying all negligence, and charging, in effect, that libelant having alleged that the ship's crew *made fast* the various parts of hoisting apparatus, it became the duty of the Stevedore Company, an independent contractor solely in charge of operation, to see, by inspection, that the same remained so during such operation. It would seem that this was an all-sufficient defense, so far as the ship's liability was concerned, under the many authorities hereinbefore cited, leaving the stevedore's liability an open question. This latter company, on July 28, 1916, filed its answer substantially denying the charges of negligence contained in the libel and amended libel, asserting the injury to have been caused by one of the ordinary risks assumed by libelant, and, further, which was very pertinent and important in bearing on the case, that it had complied with the requirements of the Maryland "Workmen's Compensation Act" (Laws 1914, p. 1429), which provided an exclusive remedy for injuries to or death of its employés by accident while in its employ, at such labor as libelant was doing at the time he was hurt, by reason whereof it was absolved from any demand or liability in any action brought against it by libelant for his injury sustained. The situation was very acute. It could not be denied from the evidence taken that the Stevedore Company was an independent contractor: that the relation of master and servant did not exist between libelant and the ship; that the accident was an incident of the operation which had been going on for two and a half days, during which time at least 200 tons of sand ballast had been unloaded, and 250 tons of copper had been loaded, with the Stevedore Company in full charge and control; that this company was rushed with work on this and other ships, and in consequence had made no inspection at all of the tackle, gears, and derricks, although ordinary care required such inspection at least every day before starting work (so testified by the old and experienced shipmaster, Folkenberg); yet this Stevedore Company was relieved by law, and no hope remained for recovery unless something could be discovered to hang a negligence charge on against the ship. It would seem that this law providing indemnity for the injury to libelant and barring his action against his immediate employer would bar also his action against his employer's principal, the ship. In my judgment, it would and does and should be so held by us.

Be that as it may, the situation for recovery by libelant in any phase of the situation was critical. On July 26, 1916, the court, by order, had set the case down for general hearing, and, on a motion to dismiss, for September 28th following. Meanwhile the libelant had died. When the hearing day arrived, a libel and complaint in personam was filed against the ship corporation and persons interested in ownership in behalf of decedent's widow and children. The two libels were, by consent order, consolidated, and, against protest, second amended libel in the original cause was permitted to be filed. In both of these new pleadings the original statements are reformed, carefully omitting the original allegation that the apparatus had been "made fast" by the ship's crew, and alleging that the injuries were sustained

"either because the pin had not been properly secured in the shackle, or because the threads on the pin and shackle were *badly* worn and allowed the pin to work out." And, further, that "those in charge of the ship" were negligent in "refusing to put up additional guys or preventers and in failing to inspect the rigging during the time it was used." Thus the whole alleged negligent cause of injury was shifted, illustrating how vicious it is to allow "conjecture" and "guess" to be the basis of an action of this kind where substantive fact, by the law, is required.

Immediate hearing was had on this 28th of September, the day these new pleadings were filed; answers prepared later were as of that day filed nunc pro tunc.

After examining the attendant physician, the libelants introduced the inevitable expert. His name was Mills. He was somewhat of an expert too! From his evidence it was disclosed that he had been for 20 years a seaman as an apprentice and officer (he does not state what officer, when or for how long) in the merchant marine, then went to stevedoring aboard ship, and finally "graduated" into a night watchman for a department house, not having done any rigging or stevedoring work for the last seven years. He seriously objected to being called "Doctor," declaring he had been "pretty much every thing else in my lifetime but a doctor or a lawyer." In short, clearly, a "jack of all trades," not yet landed in the "professional ones." He was ready and prompt to express his opinion that the screw threads of both pin and shackle were badly worn and to attribute the accident to this direct cause. When we remember that expert testimony is to be regarded ordinarily as the most unreliable kind permitted by law, it is hard to give much credence to this testimony when it is contradicted (a) by the undisputed evidence of the storekeeper, the boatswain, mate, and captain that it was carefully inspected and oiled before put to use; of (b) the boatswain that it was screwed in tight with a marlin spike; and (c) that it held for two and a half days under severe use, when at least 450 tons of sand ballast and copper was handled. It certainly is not entitled to any more credence than that of the expert subsequently introduced by the ship in the person of Arthur Skijold Folkenberg. This man was the master of the Danish ship General Konsul Pallisen, present because his ship was in port at Baltimore, expecting to sail the next day. He did not know the captain of this ship Student, and had never seen the ship itself. He had followed the sea since he was 15 years old, a period of 23 years, had been in the employ of the same company continuously for 15 years, held a master's certificate, for the last 9 years working up to this grade through all the lower ones, and had the handling of rigging, such as that in controversy, for 11 years. I quote from his testimony:

"Q. Will you look at this shackle and pin marked Respondent's Exhibits 1 and 2, and tell me, in the first place, with reference to the shackle, whether or not there are any threads in that eye which are stripped? A. No, there are not. Q. So far as the threads are concerned, what is its condition? A. In good condition. The Court: Are the threads worn at all? The Witness: No, sir. Q. With reference to the shackle itself, what is its condition? A. The shackle has been used; it is not a new shackle, but it could be used safely

when it is screwed tight with a marlin spike.  Q. In the shackle you have in your hand one arm is bent, is it not?  A. Yes.  The Court: Take the pin and see if a marlin spike would be of any use to you.  (Witness screws pin in shackle as far as it will go.)  The Witness: Now it wants a marlin spike at this moment to get it tight.  But of course when you screw it in from the other side, which you cannot do, now that it is bent, it will press that in line there, the bent arm, by pressing against the breast of the pin, and you can tighten it up to there so that there will be a heavy friction before it could loosen.  Q. I understand you to say that when the shackle is not bent and the pin is properly inserted that in order to tighten it, with reference to the eyes of the shackle, that a marlin spike is necessary?  A. Yes.  Q. Will you look at the threads on the pin and tell me whether or not they are stripped?  A. Yes; it seems to me from the thread that this has been used.  Q. Has that use to which it has been subjected in any way interfered with its proper usefulness as a pin in this particular shackle?  In other words, is it so worn as to interfere with its being effectively used in this shackle?  A. No. Q. Would you regard that or not as a satisfactory pin for the use to which it was put?  A. I would.  Q. Would you regard the shackle as a satisfactory shackle?  A. I would.  Q. Is there any question but what that shackle and that pin were altogether satisfactory for the use to which they were put?  A. It is entirely satisfactory for the place where it was used.  Q. When you screw the pin into the head of the shackle tight with your hand, is there any lateral movement whatsoever?  A. None.  Q. When you unscrew it a part of the way there is a movement, isn't there?  A. Yes.  Q. Look at the shackle filed by the libelant (new shackle) and see if it is not true that it shakes in the same way when it is partly removed?  A. It does.  Q. Does it shake just as the other shackle did?  A. Yes; it is shaking just the same.  Every shackle will do it, of course.  Q. No matter whether the shackle is new or old?  A. Yes. Mr. Wolf: You cannot tighten that up as you did the other one, can you?  The Witness: No; that is simply because this one has not been used.  As soon as it has been used one time you can do the same with this shackle (indicating new shackle).  If we had to put a shackle in for every time it is used, I think the ship would have to be loaded with shackles.  Q. Is there any reason why, as a master of steamship, you would condemn this shackle for the purpose for which it was used on board the steamship Student?  A. No, sir.  The Court: When it was to be used on that kind of strain, the direction of strain, would you screw the end of it and wire it, or something of that sort?  The Witness: I think it is unnecessary, sir, for that work.  If it was necessary to secure it with a piece of string or a piece of wire, I would condemn the shackle for that purpose."

This testimony of this witness bears weight with me for several reasons:

First. Because, after a very careful examination, at the time the case was argued and submitted to us, but before I had read it, my judgment as to the condition and sufficiency of this shackle and pin exactly tallied with it.

Second. Because it is corroborated not only by the ship's witnesses, but by witness Brink, the Stevedore Company's foreman, who admits the threads inside the eye of the shackle were not worn; that while the threads of the pin were worn a little, from his experience he thought the shackle and pin "ought to answer the purpose."  Also by the evidence of Kacher, the Stevedore Company's boss rigger and inspector, as set forth in the excerpt from his testimony hereinbefore set forth.

Third. Because it was in accord with the judgment of the learned trial judge that the pin was only a little worn.  He says in his opinion: "I do not know that it was so worn that it would have worked out more

243 F.—52

than one time in a hundred.  Perhaps it would not.  \* \* \*  I might hesitate to say that the use of a pin worn no more than the one in question was worn was by itself negligence."  The learned trial judge had carefully examined the pin and shackle, and was in doubt as to whether once in a use of a hundred times it would have pulled out; thought it probably would not.  To hold an employer negligent because he does not provide against such a contingency as that is surely equivalent to making him an *insurer*.  To what, in practical effect, must such a ruling lead?  A pin, it is true, may be an inexpensive thing, but the rule of law must be a general one, and applicable to all appliances used in industries.  Thousands upon thousands of machines are in daily use that "are a little worn"; might once in a hundred times "but probably not," break and injure an operative.  Must they be discarded and new ones bought, in many cases at a cost of many dollars, so soon as they get into this condition of "a little worn"?  An appliance, implement, or machine when once used becomes "a little worn"; who is to say how little or how much?  If, in cases like this, the evidence of men like Mills, the expert, and Karl Schultz, the winch driver (himself more than likely, at least in part, responsible. for this deplorable accident, as indicated hereafter), is to preponderate over such evidence as that of experienced men like Brink, Kacher, Folkenberg, Watson, and other of the ship's officers, and establish the fact that the slightly worn condition of the threads of this pin were sufficient to establish negligence and make the ship responsible for an award of $5,000, how many industries must go out of business?

Another question arises in this connection: Did this pin pull out instantly, or did it gradually work loose and then come out?  If it came out instantly, after two and a half days' hard strain upon it, it must have done so because of some unusual and severe wrench of it not experienced by it in the two and a half days' prior use of it.  If it worked itself loose and came out gradually, it did so solely during the time it was in the charge and control of the Stevedore Company and when, in plain view, fastened to the ship's rail, its loosened condition would be plainly apparent.  Common knowledge tells us that bolts and pins like this will, no matter how little worn from use, work loose and become unscrewed.  How strong and applicable the commonsense statement of Folkenberg that, in view of this fact, his opinion is that "it is the duty of the stevedores or whoever works with the gear to inspect it at least every day before they start with it."  Mills, the expert, has an original idea about it.  He *supposes* that for some reason "the shackle sprung open may be three-eighths or a half an inch and came off of that bolt and then sprung back again."  In other words, some extraordinary wrench or strain, that could not be anticipated, sprung the shackle loose, which, under all the rules of law, reduced the case to one of pure accident, unless such wrench or strain was due to negligence in operation, for which the Stevedore Company and not the ship could be held responsible.  However, this was conjecture and guesswork pure and simple.  The learned trial judge, in effect, recognizing that the coming out of the pin in itself could not sustain the charge of negligence, and that the screw threads of the pin, instead of being *badly* worn, as charged by libelants, were so *little*

worn as to make it improbable that they would fail to hold once in a hundred times' use, resorts to the other last-hour alleged ground of negligence—the failure of the ship to furnish preventer guys. I am entirely reconciled to the conclusion reached by the trial judge upon the disputed question as to whether such preventer guys were demanded by the Stevedore Company and refused by the ship, holding that such demand was so made and refused, but to the conclusion drawn by him therefrom I distinctly dissent, for two reasons:

First. Because no rule of ordinary care required such preventers to be either furnished or used. If anything has been proven beyond question—yes, admitted—it is that this whole hoisting outfit furnished by the ship was in all respects superior. Double blocks were used when single ones were considered sufficient; the guy provided was rove in four parts, when general custom only required two, or, at the utmost, three; and the rope used was new, large, and in good condition. This preventer simply meant to provide an additional guy, and its requirement was like requiring a man to put on two suits of clothes instead of one, as stated by one of the witnesses. A man clothed in a heavy suit of clothes, putting on another, would find it both unnecessary and in the way, and so the old and experienced Danish master, Folkenberg, says, when he is sure the guy is right, he never puts up a preventer "because it will only be in the way." But more important still is the statement made by Kacher, the Stevedore Company's boss rigger and inspector. When hurriedly leaving the ship—for he had a lot of work to do—he told young Bradley, the stevedore's foreman, to get preventer guys put on the head of the boom. Asked the question, "Why did you tell him that? Was there anything about the gear to indicate that preventer guys were necessary?" he answered: "No, sir; but it is customary *now and then*. We always do it for safety ourselves. *We are about the only people that uphold the preventer guy system.*" Young Bradley, the foreman, he said was the son of the stevedore, by which I presume he meant the chief officer or manager of the Stevedore Company. It was a hobby of this company, it would seem, contrary to the practice of all the other stevedores, to put up these preventer guys. The law says:

"It is not demanded that the master shall use the newest and best appliances. It is sufficient if he furnishes machinery and appliances reasonably safe, or safe according to the usages and habits and ordinary risks of the business; the standard is the conduct of the average prudent man." 8 Thompson, Neg. (White's Supplement) § 3993, and numerous cases cited. Also case note to Mamie Chrismer v. Bell Tel. Co., in 6 L. R. A. (N. S.) 492, where authorities are collated.

Again, practical experience demonstrates that, in the use of appliances of this kind, unnecessary and superfluous parts are not only "in the way," but sometimes the direct cause of injury. Does any one doubt that if the preventer had been rigged up, and this accident had been the direct result of its rope somehow becoming twisted or tangled with the other rigging or tackle, that libelants would be here earnestly contending that it was negligence to use or suffer its use; that such use was contrary to general custom, and only calculated to complicate, hinder, and endanger operations?

But, second, this Stevedore Company, as independent contractor, owed to its employés a nonassignable duty to furnish them with reasonably safe appliances with which to work. It could not shirk this responsibility—it was an unshirkable, nonassignable obligation. It could not plead ignorance for not performing such duty or for relying upon the judgment of another. If the use of a preventer was necessary, it knew that fact far better than the ship or any one else. Therefore this nonassignable duty, on its part, to this libelant and other employés, required absolutely one of two things to be done by it —peremptorily to refuse to undertake the work until the ship rigged up such preventer or to rig it up itself. No contractor, seeing and knowing the defective and dangerous character of appliances, can willfully subject his employés to injury and death, and excuse himself upon the plea that he was not furnished sound and safe ones. This Stevedore Company says it asked for this preventer, the ship deemed it unnecessary, the company manifestly concluded it was not, accepted the appliances without, went on and unloaded 200 tons of sand ballast without it, then rigged up the preventer, and now denies responsibility upon the ground that it did not properly rig it up, wherefore it proved wholly ineffective.

Third. If I am right in the foregoing position that it was the duty of the expert Stevedore Company to its immediate employés to supply at the place of accident this preventer, and that it actually did do so, who on earth but it could be responsible for not supplying a sound one and for not rigging it properly? It might charge the ship, under certain circumstances, for the extra expense; but this would not justify them to shift the duty onto the ship for the accident to its immediate employé on the ground that it willfully supplied for his safety an insufficient, improperly rigged, and worthless appliance.

But, finally, at the suggestion of the expert night watchman, Mills, it is suggested that some kind of a wire or string somehow should have been used in connection with the pin to render it safe. The same old cry in all these cases—*something* better might have been used; *something* unusual added! The answer is the law as stated, and the very decisive and common-sense fact stated in effect by Folkenberg, that pins of this character are manufactured with a view to be sufficient in themselves, and, if so worn and defective as to require such extraneous additions as wires and strings, should be discarded and not used.

Very naturally, during this extended course of changes in base, conjecture, and guesswork on the part of proctors for libelants, to discover some negligent cause on the part of the ship for the accident, the proctor for the ship, on his part, advanced some conjectures and guesses to account for it, for which the ship could in no way be responsible. Among these were, first, that in the course of the operation and use of the apparatus some fellow servant of the original libelant may have unscrewed the pin, attempted to put it back, and did not do so effectively with a marlin spike as was required to be done. In support of this is the undisputed fact that originally it was screwed in by the boatswain with its head *inward* so that if it came

out it would naturally fall inside of the ship's rail on its deck, while in fact it did fall *outside* the rail of the ship on the deck of the lighter boat. The learned trial judge states the theory of the ship's proctor in this regard, based on this fact, is a plausible one, "perhaps even a probable one, but he is not prepared *to be absolutely certain* as to whether that pin might not have struck the rail or something else first, and have bounced in any direction." Could it be less plausible or probable, or could he be less *absolutely certain*, about the slight wear of the pin threads causing it to come out? Where comes the proof by substantive evidence, the burden to produce which was by law upon the libelants, that either theory did or could account for the accident?

Second. It was an undisputed fact that the copper plates to be lowered were secured by chains leaving the ends not protected in any way, instead of loading them in tubs or shovels, as zinc plate was taken in, and which was the safer and better way. From this it is argued that the plates spread over greater space as they dropped in the hold, and this was the proximate cause of the victim being struck. It may be so. To me it seems as reasonable as any other conjecture advanced, except the next one to be adverted to; but who can tell from the evidence where a bucket or shovel would have slid to in that hold and whether it would have struck the poor victim or not?

Third. The second mate, Palmer, the first officer, Sliney, and the captain, Watson, all testify that during operation they severally complained that the winches were not properly operated; that they were so worked that one winch in effect was allowed to heave against the other, whereby overstress and strain was caused, and the tackle was not permitted to come in on an angle of 45 or 60 degrees, but at one of more than 60 degrees, which no tackle could stand. The second mate says he repeatedly complained of this to watchmen; the first officer testifies he spoke to the stevedore about it; the captain testifies that after 4 o'clock in the afternoon of the day before the accident he complained to the winchman, the hatchman, and everybody assembled around, saying to Bradley, the young foreman: "You fellows will be killing somebody yet." In this he is fully corroborated by the engineer, Garden, who was present and suggested shutting off some of the steam. The latter also testifies to having heard the stevedore's deckman complain to the after winchman, controlling the outboard lines, that he was not looking after his signals. All three of the first-named officers express the opinion that this improper working of the winches was the cause of the accident. All this testimony is very unsatisfactorily denied by the winchman resting under the charge and by young Bradley, the foreman. It is corroborated by the fact that this Stevedore Company at the time was rushed with work and this operation was being hurriedly done. The strong conviction comes to me that this was in truth and fact the proximate cause of the accident. Be that as it may, it is sufficient to sustain my position to point out that there have been suggested seven theories in this case to account for it:

First. That the pin broke, a theory finally abandoned.

Second. That the pin was not properly screwed in—one absolutely not proven, but contradicted by positive testimony, unimpeached and uncontradicted.

Third. That the threads of the pin were *badly* worn—a theory shown to be so little substantiated by evidence and personal examination as to cause the trial court to express doubt as to whether it would come out once in a hundred times of use.

Fourth. That the extra and unusually used preventer guy, if it had been properly rigged up by libelant's immediate employer, the Stevedore Company, *might* have prevented the accident.

Fifth. That, if the copper plates had been properly loaded in tubs or shovels instead of by use of chains, leaving the ends unsecured, the plates would not have spread, and struck the victim.

Sixth. That in operation, for some cause, some one removed the pin, and failed to properly and effectively screw it back and secure it.

Seventh. That, in operation, the winches were negligently worked against each other, whereby extraordinary stress and strain was produced, the shackle was worked from the pin, and the guy rope was broken.

Could anything be more completely applicable in the premises than the words of Mr. Justice Brewer, which I have quoted, that "where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury (or court) to guess between these half dozen causes, and find that the negligence of the employer was the cause"?

But, finally, the learned trial judge, I think, very properly and wisely, in his opinion, warned counsel of the existence of the Workman's Compensation Law existing in his state, and of the risk they run in imperiling their client's rights in bringing suits for which it provides an exclusive remedy.

If these humane laws were enacted, as they have been in many of the states, for any particular reasons, above all others it has been, first, to provide compensation for those unforeseen and unaccountable accidents constantly arising, whereby the helpless victims and their families would be deprived of their means of subsistence; and, second, to establish, at the joint expense of the state, employers, and workmen themselves, an equal and uniform rate of compensation for all injuries, duly classified, received by such workmen, which could and would be promptly and inexpensively ascertained and paid to them, whereby would be abolished a practice that had, in maritime, mining, and manufacturing districts, become a scandal and reproach to the legal profession—a practice that has led some members of the bar to hunt up victims of accident, seek employment to prosecute their cases, and thereby secure large fees in case of their successful issue. This practice, significantly called "ambulance-chasing," has largely contributed to the congested dockets of the courts, state and federal, requiring the services of additional judges from time to time and greatly enhanced expense of court administration. It has been demonstrated

by the studies made of existing conditions causing the enactment of these laws that, over and- above the costs of court administration paid by government, on an average the employer has to pay, as a result of litigation, near three times the actual sum received by the unfortunate subject of the accident. The latter usually pays in cost, expenses, and attorney's fees one half of his judgment, and the employer an equivalent half over and above the judgment, in payment of court costs and attorney's fees in making his defense. Under such circumstances, the courts, it seems to me, should be earnest in sustaining and enforcing these laws for the protection of society, employers, and workmen alike. This case was one where the original libelant was entitled to the benefits of the Maryland act, and I would dismiss these libels because clearly not maintainable under the rules of law, but with the hope that the unfortunate widow and children may not even yet be deprived of the beneficent provisions of this Compensation Act.